## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Sep 22 2016, 6:48 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Nancy A. McCaslin
McCaslin & McCaslin
Elkhart, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Abigail R. Recker
Deputy Attorneys General

# IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of: L.M. and S.M. (Minor Children);

M.C. (Father)

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

September 22, 2016

Court of Appeals Case No. 20A03-1603-JT-654

Appeal from the Elkhart Circuit Court

The Honorable Terry C. Shewmaker, Judge

The Honorable Deborah A. Domine, Magistrate

Trial Court Cause Nos.
20C01-1511-JT-67
20C01-1511-JT-68

**Pyle, Judge.**

# Statement of the Case

M.C. ("Father") appeals the termination of the parent-child relationship with his sons, L.M. and S.M., claiming that the Department of Child Services ("DCS") failed to prove by clear and convincing evidence that: (1) there is a reasonable probability that the conditions that resulted in the children's removal or the reasons for placement outside Father's home will not be remedied; (2) a continuation of the parent-child relationship poses a threat to the children's well-being; (3) termination of the parent-child relationship is in the children's best interests; and (4) there is a satisfactory plan for the children's care and treatment. Concluding there is sufficient evidence to support the trial court's decision to terminate the parent-child relationship, we affirm.

We affirm.

# Issue

> Whether there is sufficient evidence to support the termination of the parent-child relationship.

# Facts

Father and K.M. ("Mother") are the parents of S.M., who was born in August 2011, and L.M., who was born in May 2013.[1] In June 2014, the children were removed from their home after photographs found on Mother's phone appeared

---

[1] Mother voluntarily relinquished her parental rights at the termination hearing and is not a party to this appeal.

to show S.M. performing oral sex on Father. A photo of Father's penis was also found on the phone. Mother admitted that she had taken the photographs; however, she explained that the children were not present when she took the photo of Father's penis. A review of the times on the photos revealed that they were all taken within a minute of each other.

[4] Three days later, DCS filed petitions alleging that the children were children in need of services (CHINS). That same day, the trial court held an initial hearing where Father entered a "general admission that the children were victims of sexual abuse and that the home was dirty and unfit." (Father's Br. 1). In addition, DCS substantiated the sexual abuse, and Father never challenged it. The children were adjudicated to be CHINS and placed in foster care. The trial court ordered Father to cooperate with DCS and to participate in all services offered, including visitation, and to address his sexual offense issues. During eight months of treatment, Father failed to progress in addressing the sexual offense issues and was unsuccessfully discharged from treatment.

[5] DCS filed a petition to terminate both parents' parental rights in November 2015. The trial court held a hearing on the petition in February 2016. Therapist Geri Bough ("Bough") testified that she began working with three-year-old S.M. in November 2014. At that time, S.M. was suffering from significant speech, developmental, emotional, and social delays. S.M. slept very little, threw excessive temper tantrums, chewed his hands until they were raw, and urinated and defecated on the floor. In addition, Bough explained that, "he had a lot of difficulty . . . with the concepts of bodies are private . . . it

did not necessarily click with him that we're not supposed to show our private parts and people are not supposed to touch our private parts. He thought that that was okay." (Tr. 131). After a year of therapy and foster parent placement, S.M.'s behaviors began to improve. Bough explained that S.M. needed a stable and nurturing home with structure that met his special needs. S.M.'s current therapist, Sarah Truex, testified that S.M. had recently been diagnosed on the autism spectrum and needed consistency and a parent who was able to advocate for him. According to Truex, S.M.'s foster mother was committed to working with him.

[6] Testimony at the hearing further revealed that Father had undergone court-ordered psychological and psychosexual assessments with psychologist Dr. Jeff Burnett ("Dr. Burnett") in August 2014. As a result of the assessments, Dr. Burnett recommended that Father participate in sex offense specific treatment and take a sexual history polygraph and maintenance polygraph examinations. Dr. Burnett explained that the use of sexual polygraphs is routine in sex offense specific treatment. Specifically, the sexual history polygraph is used at the beginning of treatment to gather additional information. According to Dr. Burnett, failure of the initial exam is "fairly common because those are done near the beginning [of treatment] in cases that start with denial of the offense . . . ." (Tr. 210). Dr. Burnett explained that failure of the exam later in treatment is a "larger concern . . . [that] often relate[s] to one's ability to . . . remain in sex offense treatment, which is related to reducing risk." (Tr. 210-11).

[7] After the assessments, Father was referred to therapist Sam Curtis ("Curtis") for anger management and sex offense specific treatment. Curtis met with Father every other week for eight months. Curtis explained that although Father addressed specific issues related to anger management, he made no progress in sexual offense specific treatment. Curtis further explained that although Father denied that anything inappropriate had occurred with his son, Father's sexual history polygraph still indicated deception after several months of treatment. At that point, Curtis discharged Father from an unsuccessful treatment. Curtis did not believe that Father's reunification with his children was possible if he did not address the sexual offense issue.

[8] Also at the hearing, DCS Case Manager David Mickelson ("Mickelson") expressed his concern that Father had not addressed his sexually maladaptive behavioral issues. Specifically, when asked if he believed that it was likely that the reasons for DCS's involvement would be remedied, Mickelson responded that he did not because Father had not completed treatment. Mickelson explained that after Curtis had unsuccessfully discharged Father from treatment, most other therapists had refused to meet with Father. Mickelson had eventually found another therapist who had agreed to meet with Father to determine whether he could work with him. Father had an appointment scheduled with this therapist for the week after the termination hearing.

[9] Mickelson further explained that "it was like pulling teeth" to get Father to visit his children. (Tr. 171). When Father failed to attend the visits, S.M. showed "significant regression" in his behavior. (Tr. 133). However, S.M. also showed

regression when Father visited. Specifically, after the visits, S.M. exhibited hitting, biting, and kicking. During the visits, S.M. refused to allow Father to change his diapers. In July 2015, the trial court ordered the suspension of Father's visits based on his inconsistent attendance and the therapist's recommendation. After the visits with Father ended, S.M.'s behavior improved. At the time of the termination hearing, Father had not seen his children in over six months.

Mickelson also testified that termination was in the children's best interests because they needed stability and consistency. He also testified that the plan for the care and treatment of the children was foster parent adoption. The court-appointed special advocate ("CASA") agreed that termination was in the children's best interests because they needed the stability that they were receiving from their foster parents.

On February 29, 2016, the trial court entered a detailed eighteen-page order terminating Father's parental rights to S.M. and L.M. Father appeals.

## Decision

Father argues that there is insufficient evidence to support the termination of his parental rights. The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *In re K.T.K.,* 989 N.E.2d 1225, 1230 (Ind. 2013). However, the law provides for termination of that right when parents are unwilling or unable to meet their parental responsibilities. *In re Bester*, 839 N.E.2d 143, 147 (Ind.

2005). The purpose of terminating parental rights is not to punish the parents but to protect their children. *In re L.S.,* 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

[13] When reviewing the termination of parental rights, we will not weigh the evidence or judge the credibility of the witnesses. *K.T.K.,* 989 N.E.2d at 1229. Rather, we consider only the evidence and reasonable inferences that support the judgment. *Id*. Where a trial court has entered findings of fact and conclusions thereon, we will not set aside the trial court's findings or judgment unless clearly erroneous. *Id.* (citing Ind. Trial Rule 52(A)). In determining whether the court's decision to terminate the parent-child relationship is clearly erroneous, we review the trial court's judgment to determine whether the evidence clearly and convincingly supports the findings and the findings clearly and convincingly support the judgment. *Id.* at 1229-30.

[14] A petition to terminate parental rights must allege:

> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> >
> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> >
> > (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

IND. CODE § 31-35-2-4(b)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *K.T.K.,* 989 N.E.2d at 1231.

[15] Here, Father argues that there is insufficient evidence to support the termination of his parental rights. Specifically, he contends that the evidence is insufficient to show that there is a reasonable probability that: (1) the conditions that resulted in the children's removal or the reasons for placement outside the parent's home will not be remedied; and (2) a continuation of the parent-child relationships poses a threat to the children's well-being.

[16] At the outset, we note that INDIANA CODE § 31-35-2-4(b)(2)(B) is written in the disjunctive. Therefore, DCS is required to establish by clear and convincing evidence only one of the three requirements of subsection (B). *In re A.K.,* 924 N.E.3d 212, 220 (Ind. Ct. App. 2010). We therefore discuss only whether there is a reasonable probability that the conditions that resulted in the children's removal or the reasons for their placement outside Father's home will not be remedied.

[17] In determining whether the conditions that resulted in a child's removal or placement outside the home will not be remedied, we engage in a two-step analysis. *In re E.M.,* 4 N.E.3d 636, 643 (Ind. 2014). We first identify the conditions that led to removal or placement outside the home and then determine whether there is a reasonable probability that those conditions will

not be remedied. *Id.* The second step requires trial courts to judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing any recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.*

[18] Here, our review of the evidence reveals that S.M. and L.M. were removed from their parents' home because Father was sexually abusing three-year-old S.M. Father was unsuccessfully discharged from sexual offense treatment because he had made no progress in addressing this issue after eight months of treatment and showed deception in a sexual history polygraph. This evidence supports the trial court's conclusion that there was a reasonable probability that the conditions that resulted in the children's removal would not be remedied. We further note that S.M.'s negative behaviors, including throwing excessive temper tantrums, chewing on his hands until they were raw, and urinating and defecating on the floor, continued to improve after Father's visitation was suspended. At the time of the hearing, Father had not seen his children in over six months.[2] We find no error.

[19] Father also argues that there is insufficient evidence that the termination was in the children's best interests. In determining whether termination of parental

---

[2] To the extent Father argues that he planned to begin working with a new therapist, the trial court is to assess a parent's fitness for care for his children at the time of the termination hearing. *See In re B.D.J.*, 728 N.E.2d 195, 202 n. 1 (Ind. Ct. App. 2000). Father's future plans were therefore not evidence upon which the trial court could base its decision. *Id.*

rights is in the best interests of a child, the trial court is required to look at the totality of the evidence. *In re D.D.*, 804 N.E.2d 258, 267 (Ind. Ct. App. 2004), *trans. denied*. In so doing, the court must subordinate the interests of the parents to those of the child involved. *Id.* Termination of the parent-child relationship is proper where the child's emotional and physical development is threatened. *In re R.S.*, 774 N.E.2d 927, 930 (Ind. Ct. App. 2002), *trans. denied*. The trial court need not wait until the child is irreversibly harmed such that his physical, mental, and social development is permanently impaired before terminating the parent-child relationship. In addition, a child's need for permanency is a central consideration in determining the child's best interests. *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009). Further, the testimony of the service providers may support a finding that termination is in the child's best interests. *McBride v. Monroe Cnty. Office of Family and Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003).

[20] Here, our review of the evidence reveals that Father has not completed the treatment needed to provide his children with a safe environment. On the other hand, the children's foster parents are providing them with the stability and consistency of a nurturing home, and foster mother is advocating for S.M.'s special needs. In addition, both the DCS caseworker and the CASA testified that termination is in the children's best interests. This evidence supports the trial court's conclusion that termination is in the children's best interests.

[21] Last, Father argues that DCS does not have a satisfactory plan for the children's care and treatment. This Court has previously explained that the plan for the

care and treatment of the child need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated. *In re L.B.,* 889 N.E.2d 326, 341 (Ind. Ct. App. 2008). Here, the DCS caseworker testified the plan for the care and treatment of L.M. and S.M. is foster parent adoption. This is a satisfactory plan. *See In re A.N.J.,* 690 N.E.2d 716, 722 (Ind. Ct. App. 1997).

[22] We reverse a termination of parental rights "only upon a showing of 'clear error'—that which leaves us with a definite and firm conviction that a mistake has been made." *Egly v. Blackford Cnty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992). We find no such error here and therefore affirm the trial court.

[23] Affirmed.

Bradford, J., and Altice, J., concur.